1  LOUISE H. RENNE (SBN 36508)
   lrenne@publiclawgroup.com
2  RUTH M. BOND (SBN 214582)
   rbond@publiclawgroup.com
3  RAFAL OFIERSKI (SBN 194798)
   rofierski@publiclawgroup.com
4  IMRAN M. DAR (SBN 326502)
   idar@publiclawgroup.com
5  SHAJUTI HOSSAIN (SBN 322162)
   shossain@publiclawgroup.com
6  RENNE PUBLIC LAW GROUP
   350 Sansome Street, Suite 300
7  San Francisco, California 94104
   Telephone: (415) 848-7200
8  Facsimile:  (415) 848-7230

9  Attorneys for Plaintiffs

10              IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13 | D. B. as conservator for JOHN DOE 1; C.C. as | Case No.
   | guardian for JANE DOE 1; JOHN DOE 2; and JANE |
14 | DOE 2 on behalf of themselves and all others similarly |
   | situated, | **COMPLAINT FOR INJUNCTIVE,**
15 | | **DECLARATORY, AND CLASS-WIDE**
   |             Plaintiffs, | **RELIEF**
16 | |
   | | **JURY TRIAL REQUESTED**
17 | v. |
   | |
18 | CHIQUITA BROOKS-LASURE, in her official |
   | capacity as Administrator for the Centers for Medicare |
19 | and Medicaid Services; CALIFORNIA |
   | DEPARTMENT OF PUBLIC HEALTH; TOMAS |
20 | ARAGON in his official capacity as Director of the |
   | California Department of Public Health; XAVIER |
21 | BECERRA in his official capacity as Secretary of the |
   | U.S. Department of Health and Human Services; |
22 | DOES 1–30, |
   | |
23 | |             Defendants. |

24                    **<u>INTRODUCTION</u>**

25      This is a case of tragic proportions.  As set forth below, Federal and State agencies recently ordered

26 San Francisco's Laguna Honda Hospital and Rehabilitation Center to relocate its nearly 700 residents by

27 mid-September.  They must go, no matter their medical condition, or financial or social safety net.  Some

28 have already become homeless.  Eight residents have died following their relocation.  As this tragedy

RENNE PUBLIC LAW GROUP
Attorneys at Law

unfolds, the Federal and State agencies are also requiring the hospital to undertake a recertification process intended to reduce any future patient population. As it is, skilled nursing beds are in critically short supply.

Laguna Honda has a storied history, going back to the Gold Rush days of 1866, when it started as an almshouse for the poor. Today, it continues to serve the poor and others in need of good care. It takes patients from San Francisco General Hospital, people suffering trauma from accidents or violence, and those with dementia, Alzheimer's, hospice, or end-of-life needs. In today's world, its residents frequently include those with substance abuse problems, which adds to the challenge of their care.

A new Laguna Honda was rebuilt and certified in 2010 as the first green hospital in California. Its amenities include a "farm" with animals, a garden, an indoor swimming pool, and a hair salon. Art classes are held for those who may have never held a brush in their hand before. Medical staff at Laguna Honda, one of the only publicly-owned facilities of its kind, are on duty daily—something rare even in private facilities. During the COVID-19 pandemic, Laguna Honda's record of prevention was exemplary, especially when compared to other nursing homes.

Despite its achievements, the Federal government, under the auspices of the Centers for Medicare and Medicaid Services ("CMS") and in conjunction with the State of California Department of Public Health ("CDPH" or "the State"), ordered Laguna Honda to close and relocate all patients by September 13, 2022. After that, CMS will no longer provide the Medicare and Medicaid funding necessary to keep it running. CMS and the State are requiring the hospital to be re-certified, just as if it were brand new, with additional requirements, and to reduce the number of patients the facility can serve in the future.

When can the hospital be recertified? Will the hospital remain empty in the meantime? Can its former residents move back? If so, how and under what circumstances? These questions are unanswered.

In the meantime, relocation strikes terror in the hearts of the residents and their families as they face the prospect of eviction. Where will they go? Will their new facility be equipped to treat them? Will families be able to continue to visit? As it is, Laguna Honda represents the bulk of the available skilled nursing beds in San Francisco. There are few, if any, other alternatives in the Bay Area or even the State of California. To add to the urgency, most private facilities limit available beds for the poor, preferring a wealthier clientele.

The isolated deficiencies at Laguna Honda that led CMS to impose closure and relocation involved

RENNE PUBLIC LAW GROUP
Attorneys at Law

a small fraction of patients and were correctable.  There is an array of remedies that CMS could have invoked to address those alleged violations which would not cause the vast displacement of poor and fragile people.  In short, the draconian actions by CMS and the State are illegal, unnecessary, and cruel.

Now, Plaintiffs, by and through their attorneys, and on behalf of all members of the class of residents at Laguna Honda, bring this Complaint against the above-named Defendants and their employees, agents, delegates, and successors in office, in their official capacity to enjoin them from carrying out this injustice.

## **PARTIES**

1.    Plaintiffs JOHN DOE 1, JANE DOE 1, JOHN DOE 2, and JANE DOE 2, and the class of similarly situated persons they seek to represent, are current patients of Laguna Honda.

2.    Plaintiff JOHN DOE 1 is a patient with a brain injury, short-term memory loss, depression, dementia, and compulsive behavior.  He has lived at Laguna Honda cumulatively for 17 years.  He is 49 years old.  He feels safe and secure with his community and daily routine at Laguna Honda.  He is mostly unable to speak, but his mother can interpret his minimal communication.  She attends most of his medical appointments, such as injections, vaccinations, dental cleanings, eye exams, and podiatry care to help him cooperate.  She is a resident of San Francisco, 73 years old, works full-time, and relies on public transportation.  She visits him every day as he does not engage with many others.  Her proximity to Laguna Honda is essential for his mental and emotional wellbeing.  She fears that if he is transferred, he will be the target of aggression from other residents due to some of his compulsive behavior, which his fellow residents at Laguna Honda have come to accept.  She also fears that her daily visits will no longer be possible depending on where he is transferred.

3.    Plaintiff JANE DOE 1 is a patient with late-stage dementia.  She has lived at Laguna Honda for four years.  She is 86 years old.  Sometimes she recognizes her family members when they visit, but other times she does not.  She needs assistance with most basic needs, including eating, moving, and using the bathroom.  Her transfer was scheduled for July 15, 2022, but her family asked Laguna Honda to delay her transfer date because they found significant staffing and management issues with the facility where she was going to be transferred.  A transfer to an insufficient facility could be fatal for her.

4.    Plaintiff JANE DOE 2 is a patient with "brittle diabetes"—one of the most severe forms of

Renne Public Law Group
Attorneys at Law

1    the condition and one which is exceptionally hard to manage. She has been in and out of hospitals for

2    many years. She is 45 years old and has lived at Laguna Honda since July 2021. She and her family found

3    that other facilities could not manage her condition but have been very satisfied with the care and attention

4    provided to her by Laguna Honda staff and physicians.

5         5.    Plaintiff JOHN DOE 2 is a patient who had a hemorrhagic stroke and is now in a wheelchair.

6    Prior to that he worked at Candlestick Park, Levi Stadium and AT&T Park because he loves sports,

7    especially the San Francisco Giants and the 49ers. He has lived at Laguna Honda since January 2021. He

8    is 58 years old. He and his family appreciate the tremendous care he receives at Laguna Honda. Laguna

9    Honda has been playing a vital role in his recovery.

10        6.    Defendant XAVIER BECERRA, sued in his official capacity, is the Secretary of the United

11   States Department of Health and Human Services ("DHHS"). As such, he is responsible for administering

12   the Social Security Act. 42 U.S.C. § 301 *et seq*. and the Medicare and Medicaid Act, 42 U.S.C. § 1396 *et*

13   *seq*.

14        7.    Defendant CHIQUITA BROOKS-LASURE, sued in her official capacity, is the

15   Administrator of CMS, a division of DHHS responsible for administering Medicare, Medicaid and other

16   health-related programs.

17        8.    Defendant CALIFORNIA DEPARTMENT OF PUBLIC HEALTH ("CDPH") is the state

18   agency charged with surveying Medicare and Medicaid facilities, relocating residents at facilities

19   undergoing termination of their Medicaid and Medicare funding, and assuring that the relocation plans

20   comply with state and federal law.

21        9.    Defendant TOMAS ARAGON, sued in his official capacity, is the Director and the State

22   Public Health Officer of CDPH.

23        10.   Defendant DOES 1–30 are unknown to Plaintiffs at this time but may be officers of the

24   United States or the State of California. They are sued in their official capacity.

25                              **VENUE AND JURISDICTION**

26        11.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331,

27   1343, 1361, 1367, 1651, 2201, 2022, 42 U.S.C. §§ 1983, and 5 U.S.C. § 701 *et seq.*

28        12.   The claims arise under the Social Security Act, 42 U.S.C. § 301 *et seq.*, the Medicare Act,

RENNE PUBLIC LAW GROUP
Attorneys at Law

-4-

COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND CLASS-WIDE RELIEF

42 U.S.C. § 1396 et seq., Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*., the Rehabilitation Act of 1973 section 504, and the Fifth and Fourteenth Amendments to the United States Constitution.

13.    Venue is based on 28 U.S.C. § 1391(b)(2) and (e)(1) in that a substantial part of the events or omissions giving rise to the claims occurred and the plaintiffs reside in this District.

14.    Assignment to the San Francisco or Oakland Division of this District is proper under Civil Local Rule 3-2(c)–(d) because a substantial part of the acts or omissions that give rise to this action occurred in the City and County of San Francisco.

**STATEMENT OF FACTS**

**I.    LAGUNA HONDA**

15.    Laguna Honda is a skilled nursing facility ("SNF") and hospital owned and operated by the San Francisco Department of Public Health ("SFDPH"), an agency of the City and County of San Francisco ("the City").

16.    With 700 beds, Laguna Honda is the largest SNF in California and one of the largest in the nation.  For over 150 years, Laguna Honda has provided skilled nursing and rehabilitation services to San Francisco's most vulnerable patients, including seniors, adults with disabilities, and others who cannot care for themselves.

17.    In June 2010, Laguna Honda moved into new buildings on its 62-acre campus.  It is considered among the most modern skilled nursing and rehabilitation facilities in the Country.  Residents are organized into 13 units, also known as neighborhoods, which promote the experience of living in a community.  Residents are assigned to each neighborhood in part according to their medical and treatment needs.  Each neighborhood provides high-quality, individualized care for its patients, including facilities for people with developmental disabilities, treatment for multiple sclerosis, Parkinson's and other degenerative diseases, therapeutic services for traumatic brain injuries, services for people with psychosocial difficulties, end-of-life care emphasizing comfort and dignity, and the complex system of care required for people with multiple diagnoses.

18.    Laguna Honda is the only dedicated SNF for patients with HIV/AIDS in the San Francisco Bay Area.

RENNE PUBLIC LAW GROUP
Attorneys at Law

19.     Laguna Honda also provides a nationally recognized program for people with Alzheimer's and other dementias.  Each year, the program provides rehabilitative therapy to as many as 240 people, helping them retain and reclaim physical competency so that they can move to a lower level of care or independent living.

20.     Unlike other SNFs, Laguna Honda has a farm, a large garden, an indoor swimming pool, and an entertainment theater that provide a holistic and therapeutic environment for its residents.

21.     In November 2020, Laguna Honda received the Top Honor for the 200 Quality Leaders Award from the California Association of Public Hospitals and Health Systems for its successful response to the COVID-19 pandemic, which included cutting-edge infection prevention and control systems to protect its patients.

22.     In January 2021, the San Francisco Health Commission recognized every Laguna Honda employee and volunteer for their heroic work and vital contributions during the COVID-19 pandemic to benefit the health and wellbeing of residents.

## II.     THE PROVISION OF MEDICARE AND MEDICAID TO STATES

23.     Title XIX of the Social Security Act authorizes DHHS to grant funding to states to help pay for medical assistance for low-income individuals, people with disabilities, and seniors.  States must adopt and adhere to a "state plan" for medical assistance pursuant to 42 U.S.C. § 1396a to be eligible for this funding.  Included is a requirement that the plan provide coverage for the "categorically needy," which includes recipients of public assistance and the "medically needy," which includes certain individuals whose income is insufficient to meet the cost of necessary medical treatment.

24.     Once DHHS approves a state plan, CMS, a division of DHHS, administers Medicaid and Medicare funding to the state.

25.     California's approved medical assistance plan is known as Medi-Cal.  Individuals with Medi-Cal receive treatment from Medi-Cal certified facilities which are then reimbursed with Medicaid funds.

26.     States enter into "provider agreements" with health care providers that serve Medicare and Medicaid patients.  To qualify as a Medicare and Medicaid provider, the provider must comply with participation requirements established by federal law.  Provider agreements are for a term of years, with

RENNE PUBLIC LAW GROUP
Attorneys at Law

near-automatic renewal unless the provider is decertified, or the provider voluntarily terminates the arrangement.

27.    Most if not all public hospitals or SNFs in California, such as Laguna Honda, could not operate without a provider agreement.  The termination of a provider agreement is a de facto death knell for such a facility.

## III.    CDPH SURVEYS LEAD TO TERMINATION OF LAGUNA HONDA'S PROVIDER AGREEMENT

28.    CDPH is California's survey agency.  In conjunction with CMS, it is charged with surveying Medi-Cal providers to make sure the facilities comply with federal law.

29.    From October 2021 to April 2022, CDPH conducted six abbreviated surveys of Laguna Honda.  Based on these surveys, CDPH alleged a series of deficiencies, most of which were self-reported by Laguna Honda and commonly occur at other SNFs.  The alleged deficiencies included 13 residents testing positive for non-prescribed substances; 23 residents possessing "contraband;"[1] and 11 residents possessing lighters.

30.    The deficiencies identified could be reasonably anticipated at a large SNF that cares for many residents with substance abuse disorders in the middle of a large city.  Laguna Honda also must comply with the Patients' Bill of Rights, which provides patients a reasonable expectation of privacy in their rooms, the right to receive unopened mail, and to freely come and go from Laguna Honda (with some restrictions) whether on a pass or against medical advice.  Upon investigation, Laguna Honda found that residents were obtaining "contraband" when they left the facility despite staff's extraordinary efforts to identify and confiscate substances and contraband from patients and their visitors entering the facility, while respecting their privacy rights.

31.    Promptly after receiving each of CDPH's notices of deficiencies, Laguna Honda developed and submitted detailed Plans of Correction to address and prevent further problems.  Collectively, Laguna Honda's Plans of Correction set forth almost 120 corrective actions it would take or had already taken to address the alleged deficiencies CDPH identified.  The plans listed the persons responsible for taking each

---

[1] Upon information and belief, the contraband included marijuana, a pocket-knife, scissors, smoking paraphernalia, and bottles of alcohol.

COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND CLASS-WIDE RELIEF

RENNE PUBLIC LAW GROUP
Attorneys at Law

of those actions, the completion date of those actions, and ongoing actions Laguna Honda would take to prevent future deficiencies. The corrective actions included clinical searches to confiscate contraband; the creation of a facility-wide system for the handling and disposition of contraband including a new tracking procedure; a new monitoring assessment for residents coming and going from the hospital; stationing deputy sheriffs at the facility to prevent, identify, and respond to the use of contraband by residents; installation of prescreening technology at facility entry points; additional screening of patients with histories of substance abuse disorders; and much more.

32.     On February 24, 2022, CMS sent Laguna Honda a notice imposing a Denial of Payment for New Admissions and civil money penalties.

33.     Despite receiving Laguna Honda's detailed Plans of Correction, CDPH continued conducting abbreviated surveys and fished for additional deficiencies, without explaining to Laguna Honda the reasons why it found the Plans of Correction insufficient. Sometimes, CDPH returned for another visit before Laguna Honda even had time to address the alleged deficiencies identified from CDPH's previous visit. For example, on March 28, 2022, CDPH went to Laguna Honda for its fifth survey, and then just two days later on March 30, 2022, CDPH returned for a sixth survey.

34.     On March 30, 2022, the same day CDPH conducted its sixth and final survey, CMS issued Laguna Honda a notice of "Termination of Provider Agreement," effective April 14, 2022. CMS also imposed civil penalties of nearly $400,000 on the facility.

35.     Upon information and belief, the sanctions listed above are far more severe than what CMS and CDPH generally impose on facilities for the deficiencies identified at Laguna Honda. Indeed, in a published statement, Patricia L. McGinnis, executive director of California Advocates for Nursing Home Reform stated, "[i]t was absolutely unprecedented for this to happen in a facility that large. This is unreal…We have facilities in this state that shouldn't be able to care for my cat, much less a human, and they stay open."[2]

---

[2] Sydney Johnson, *Laguna Honda halts discharges after deaths; future of the hospital still unclear* (July 29, 2022), https://www.sfexaminer.com/news/laguna-honda-halts-discharges-after-deaths-future-of-the-hospital-still-unclear/article_f5563e42-0ec2-11ed-8a35-bf7fec064aad.html?utmsource=sfexaminer.com&utm_campaign=%2Fnewsletter%2Foptimize%2Fexaminer-daily%2F%3F-dc%3D1659049233&utm_medium=email&utm_content=headline

36.    The City has filed three requests for hearings with the DHHS Departmental Appeals Board regarding flaws in CDPH's surveys and the sanctions imposed by CMS.  The City filed these requests on February 15, 2022, April 25, 2022, and May 28, 2022.

37.    As set forth in the appeal filed by the City on May 28, 2022, CDPH applied a "zero-tolerance policy" for contraband on Laguna Honda that was contrary to federal law both because it conflicted with the four-factored test for deficiencies outlined in the CMS State Operations Manual and because it made Laguna Honda responsible for hazards beyond its control.  As explained by the City in its appeal, had CDPH not applied this illegal policy, Laguna Honda would have been in substantial compliance and its provider agreement could not have been terminated.

## IV.    CMS AND CDPH IMPOSE A DEFICIENT RELOCATION PLAN

38.    When CMS and a state survey agency terminate a skilled nursing facility's provider agreement, the facility may need to relocate its residents.  This occurred when CMS and CDPH terminated Laguna Honda's provider agreement because its patients are almost entirely indigent and thus the hospital is almost entirely reliant on Medi-Cal and Medicare reimbursement.  Upon information and belief, CMS and CDPH illegally imposed a deficient relocation plan on Laguna Honda requiring it to transfer its residents to other facilities in just four months, despite the recognized shortage of certified Medicare and Medicaid beds in the San Francisco Bay Area and of affordable housing for patients who will be discharged.  CMS and CDPH directed Laguna Honda to implement a plan that jeopardizes the lives of patients who are low-income, elderly, and suffer from chronic illnesses and disabilities.

39.    When CMS and CDPH issued Laguna Honda its termination notice, CMS indicated that it would provide post-termination funding to Laguna Honda on the condition that SFDPH "submit a notification of relocation under § 483.70(l)" for the hospital.  Upon information and belief, CMS and CDPH told SFDPH that assistance would only be provided for existing patients after April 14, 2022, and that they would only recertify the facility if SFDPH adopted a relocation plan with terms agreeable to CMS and CDPH.  SFDPH had no choice but to follow this direction.

40.    Upon information and belief, CMS representatives advised SFDPH to prepare a closure and relocation plan that would meet the requirement of 42 C.F.R. § 483.70(l), as well as a CMS Recertification Milestone Document ("Milestone Document") detailing milestones that, if met, would put Laguna Honda

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

on a defined path to recertification in the Medicare and Medicaid programs, preventing a closure from going into effect.  However, despite encouraging SFDPH to prepare and submit the Milestone Document, CMS changed course and rejected it without explanation and insisted that the facility follow through with a relocation and closure plan requiring discharge and transfer of all residents.

41.     SFDPH then proposed a relocation plan that would relocate its residents over the course of eighteen months.  Even that timeline was optimistic given that there is a critical shortage of SNFs in California and the Bay Area, and Laguna Honda is one of the nation's largest and most complex SNFs. SFDPH had significant concerns that a shorter relocation timeline would jeopardize the health and safety of its residents.  However, CMS and CDPH insisted that the facility complete the relocation in four months; a time-span far too short given the size and complex needs of Laguna Honda's residents.  A four-month time frame also conflicted with the City's due process rights in that its three administrative appeals against CDPH's findings and CMS's sanctions would not be resolved prior to the closure and relocation.

42.     SFDPH also proposed that patients be transferred or discharged based on a tiered system that would allow patients who did not require significant healthcare treatment to be moved before patients with more complex needs.  CMS and CDPH rejected this proposal as well, directing SFDPH to transfer all patient populations simultaneously, including those in end of life or palliative care.

43.     To Plaintiffs' knowledge neither CMS nor CDPH has provided a rationale for its requirement that all residents are relocated in four months or why a system that relocated patients in tiers based on their vulnerability was inappropriate.

44.     On May 13, 2022, the SFDPH reluctantly submitted its relocation and patient transfer and closure plan (the "Relocation Plan") to CMS and CDPH, as mandated by CMS and CDPH for continued funding.  CDPH approved the plan.

45.     The Relocation Plan includes the September 13, 2022 deadline to relocate its Medi-Cal and Medicare residents and does not include a tiered system to protect vulnerable residents who require complex or specialized care.  The City and Laguna Honda have significant concerns that a Relocation Plan on such a short timeline would jeopardize the health and safety of residents.

46.     On July 15, 2022, the City sent a letter to CMS requesting that it continue Laguna Honda's Medicare and Medicaid funding until the resolution of its appeal hearing, given that its administrative

appeals process almost certainly will not conclude before November 13, 2022.  Specifically, CMS's prehearing brief is due on August 31, 2022, and Laguna Honda's response brief is due on October 5, 2022.

47.    Upon information and belief, CMS and CDPH have primarily communicated with Laguna Honda verbally and have refused to communicate their directives to Laguna Honda in written form.  Upon information and belief, the two agencies have operated in this manner to cloak the degree to which they have orchestrated this catastrophe.

## V.    OVERVIEW OF RELOCATION PLAN DEFICIENCIES RESULTING FROM CMS AND CDPH ACTION

48.    Both federal law and state law govern relocation plans upon the termination of a SNF's provider agreement.  *See* 42 U.S.C. § 1320a-7j(h)(1)–(2); 42 C.F.R. §§ 483.15, 488.26; 483.70(l)–(m); Health & Safety Code §§ 1325, 1336.2; CMS State Operations Manual §§ 3008–3008.3C.

49.    Laguna Honda's Relocation Plan, as imposed by CMS and CDPH, states the following as its objectives:

> The intent of this Closure Plan is to ensure the safe, orderly, and clinically appropriate transfer or discharge of each patient with a minimum amount of stress for patients, families, guardians, and legal representatives (collectively, Representatives). All Medicare and Medicaid beneficiary patients will be discharged or transferred to the most appropriate setting possible in terms of quality, services, and location, as available and determined appropriate by the resident care team after taking into consideration the patient's individual needs, choices, and interests. (Note that this Closure Plan only relates to Medicare and Medicaid beneficiary patients.) This objective shall be accomplished in as expeditious manner as possible under the circumstances, as set forth herein. Laguna Honda shall use reasonable best efforts to achieve the time frames set forth herein.

50.    However, the short four-month deadline imposed by CMS and CDPH prevents the Relocation Plan from "ensuring the safe, orderly, and clinically appropriate transfer or discharge of each patient with a minimum amount of stress for patients, families, guardians, and legal representatives." Rather, it assures the unsafe, disorderly, inappropriate transfer or discharge of each patient, resulting in tremendous stress, emotional and physical harm to Plaintiffs and all residents and their families.  Upon information and belief, since CMS and CDPH ordered the discharge and transfer of residents, eight relocated residents have died.  CMS and CDPH's unreasonable September 13, 2022 deadline jeopardizes

the lives of hundreds more.

A.   **CMS and CDPH's Four-Month Deadline Prevents Laguna Honda from Ensuring Safe and Orderly Transfers Given the Lack of Available Beds**

51.   Federal law requires facilities to "provide and document sufficient preparation and orientation to residents to ensure safe and orderly transfer or discharge." 42 C.F.R. § 483.15(c)(7).

52.   CMS and CDPH's four-month deadline prevents Laguna Honda from providing sufficient preparation and orientation to residents to ensure safe and orderly relocation. The sheer number of Laguna Honda residents and lack of available beds exposes this glaring deficiency with the four-month deadline.

53.   When Laguna Honda submitted its Relocation Plan, the facility had 686 residents. Approximately 540 of those residents were on Medi-Cal and 126 on Medicare. At least 480 are considered to have multiple conditions, disabilities, and especially complex needs.

54.   The Relocation Plan specifically acknowledged that there is a critical shortage of SNF beds in the San Francisco Bay Area such that it is practically impossible to relocate these residents to appropriate facilities:

> Nationwide, and specifically with respect to the San Francisco Bay Area, there is a recognized shortage of Medi-Cal beds in Skilled Nursing Facilities (SNFs). Not counting Laguna Honda, in 2020, there were only about 340 Medi-Cal certified hospital-based SNF beds in San Francisco. In addition, only 368 out of approximately 845 total free-standing SNF beds were Medi-Cal certified in 2020. San Francisco only had approximately 16 SNF beds per 1,000 adults aged 65 and older in 2020.1 According to a report compiled by the San Francisco Department of Public Health (SFDPH), Office of Policy and Planning, on SNF bed shortages in San Francisco and the Bay Area, San Francisco has the largest number of SNF beds in the Bay Area, however, between 2013 and 2020, there was a 23.4% decrease in hospital-based and 10.6% decrease in free- standing SNF beds in San Francisco and a 2% decrease across the Bay Area. Given the size of Laguna Honda, the limited availability of SNF beds and beds in other appropriate placements in the San Francisco Bay Area and California, the processes required for notice and discharge, and the complexity of Laguna Honda's patient population, many of whom have a combination of behavioral health needs, substance use disorders, and other complicated social and medical factors, the process to transfer and discharge patients will need to occur over a period of time.

55.   As explained in the Relocation Plan, "[t]he patient population at Laguna Honda is large and complex. Many patients have complicated chronic medical needs along with behavioral health components

RENNE PUBLIC LAW GROUP
Attorneys at Law

(such as diagnosed mental illnesses and/or substance use disorders) and other social or behavior issues. This makes placement difficult in many situations, as some facilities do not have the capability or capacity to serve patients with certain medical and/or behavioral needs."

56.    Given the shortage of available beds in the San Francisco Bay Area and the complex needs of Laguna Honda's patients, the Relocation Plan imposed by CMS and CDPH would inevitably require relocation of many residents to facilities far from their families and communities.  The Relocation Plan "anticipates that placements will be necessary outside of the San Francisco Bay Area, including Northern California, the Central Valley, Southern California, and possibly to other states.  Transfers to other states will require additional time because each patient's Medicare and Medicaid benefits will have to be transferred to the receiving state."  The vast majority of Laguna Honda's residents rely on their families and communities for not only emotional support in their most difficult stage of life, but also for critical decision-making in their medical care and end-of-life needs.  Notably, a substantial number of patients have issues with legal capacity.  Displacing them to other parts of the state, or even out of state, would strip them of their critical support system.

57.    State and federal law require SNFs to complete comprehensive assessments for each patient prior to any transfer or discharge during a facility closure.  Therefore, the Relocation Plan first requires Laguna Honda to review all patients' charts to identify those who could be discharged to lower levels of care.  Second, an interdisciplinary team assesses each patient and their medical records, while Laguna Honda conducts (a) medical and nursing assessments to identify particular needs or behaviors, including those that could complicate placement or increase the risk of transfer trauma; (b) social assessments that "identify specific social needs such as family and social services supports or other program requirements, including preferred activities inside and out of the facility, interests, and other preferences;" and (c) assessments on each patient's "functional capabilities and health needs" including "the patient's comorbidities, physical, psychological, and psychosocial functioning in addition to any treatments (*e.g.,* end of life care, oxygen therapy, dialysis) or therapies (*e.g.,* physical, occupational, speech, restorative nursing) needed."

58.    Based on these assessments, each patient is assigned to one of the following groups for relocation:

RENNE PUBLIC LAW GROUP
Attorneys at Law

**Group 1 (people who do not require significant residential/inpatient healthcare or SNF level of care)**: discharge with no significant facility care needs, including discharge to home or other housing or placement with significant community supports as necessary;

**Group 2 (people who require a lower level of care in a residential placement but not SNF level of care)**: discharge to a lower level of care, such as board and care or residential supportive housing;

**Group 3 (people with SNF level of care needs)**: transfer to a skilled nursing facility; and

**Group 4 (people who need care above the SNF level of acuity)**: transfer to a higher level of care, such as psychiatric health facilities.

However, the Relocation Plan acknowledges that there will "likely [be] placement delays" and Laguna Honda will need to modify patient assessments and the above categorizations because it "expects placement to be challenging based on specific factors…such as the presence of complex medical needs…or mental health, substance use, or other social/behavioral needs."

59.    After classifying the residents and meeting with them and their families, Laguna Honda, in conjunction with the California Department of Health Care Services ("DHCS") and CDPH, attempts to match them with facilities that can accommodate each of their complex needs.  Laguna Honda will only transfer patients in Group 3 to another SNF or to a hospice facility and patients in Group 4 to "Locked Subacute Treatment" facilities, psychiatric SNFs, or a state psychiatric hospital.

60.    Upon information and belief, CMS and CDPH allowed patients to reject their relocation placements only until July 15, 2022.  After that date, patients could not refuse a placement, although they would still have a right to appeal the placement.

61.    There simply are not enough beds available to accommodate Laguna Honda's patients.  A preliminary survey of SNFs found that as of May 2022, only 16 Medi-Cal certified beds were available in San Francisco and only three to six qualifying beds were available in surrounding counties.  Although there were 240 available beds at non-skilled nursing facilities in San Francisco, Laguna Honda anticipated that the majority of those beds were not suitable for its residents in Group 2 because "[t]he needs of these patients cannot be maintained with the services available at places like board and care, or residential hotels. These patients will require extensive assistance from care-giver professionals for 8 hours a day or more."

RENNE PUBLIC LAW GROUP
Attorneys at Law

62.    At the time the Relocation Plan was issued, there were 4,000 long-term care facilities, including SNFs, in California. Laguna Honda planned to call 80 facilities a day for 50 days to locate beds to relocate its patients. As of July 18, 2022, Laguna Honda had called 9,779 facilities both inside and outside of San Francisco but could not find even close to the number of beds required. For example, during the week of July 4–10, 2022, Laguna Honda called 1,400 unique out-of-county skilled nursing facilities and identified **no** vacant beds eligible for Medicare or Medicaid reimbursement that could provide a sufficient skilled nursing level of care for its patients.

63.    As expected, Laguna Honda has been unable to relocate its patients according to the unrealistic timeline imposed by CMS and CDPH due to the severe shortage of available and adequate beds. By July 17, 2022, halfway through the four-month timeline, Laguna Honda had only been able to successfully relocate 56 out of 686 residents. Of those 56 residents, Laguna Honda discharged 16 and transferred 40 to other facilities: one in San Francisco; 35 in San Mateo County; and four in Alameda County.

64.    Upon information and belief, shockingly, eight patients, or 14% of those relocated to date, have already **died** and three discharged patients are now living in homeless shelters—all due to the cruel, senseless, and tragically misguided directives of state and federal bureaucrats which were issued without explanation.

**B.    CMS and CDPH's Actions Deny Patients their Rights to Adequate Notice**

65.    Federal law requires that patients receive a notice at least 30 days before the transfer or discharge that includes "the location to which the resident is transferred or discharged." 42 C.F.R. § 483.15(c)(3)-(c)(5); *see also* 42 U.S.C. §§ 1396i-3(c)(2)(B), 1396r(c)(2)(B).

66.    On May 16, 2022, all patients and their decision-makers received the Relocation Plan and a 60-day relocation notice. However, the May 16 notice does not state each resident's transfer or discharge location—just that the resident would be transferred. Indeed, Laguna Honda still needed to conduct the assessment and match-making processes described above before confirming the residents' transfer or discharge location.

67.    Starting July 15, 2022, CMS and CDPH require all patients to accept their assigned placement. However, upon information and belief, many residents still do not know the location of their

RENNE PUBLIC LAW GROUP
Attorneys at Law

placement. As of July 17, 2022, only 56 out of 686 patients had been transferred or discharged due to the difficulty of finding adequate beds. It is highly unlikely that all remaining 630 patients will receive notice of a new placement location by August 13 (30 days before the September 13 cutoff date). Thus, CMS and CDPH's insistence on a rapid relocation plan will inevitably prevent residents from receiving the notice required by law. 42 C.F.R. § 483.15(c)(3)–(c)(5).

**C.    CMS and CDPH's Actions Deny Patients their Rights to Appeal their Relocation**

68.    Federal law requires that patients have a right to appeal their transfer or discharge and a right to stay in their current facility while their appeal is pending. 42 C.F.R. § 483.15(c)(1)(ii).

69.    The Relocation Plan states that "Laguna Honda receives notice of the hearing date typically about 14 days after the patient appeals," then the State of California issues a decision approximately 14 days after the hearing. Thus, the appeal process could take about 30 days to complete.

70.    Laguna Honda has been waiting over a month for answers from CDPH, DHCS, and CMS to important questions about the appeals process.

71.    Laguna Honda had asked CDPH and CMS "about payment obligations during the appeals process" but was still awaiting clarification from them as of July 18, 2022.

72.    CMS also reports that extended funding is contingent on progress in transferring and discharging patients, but it had not communicated progress metrics to Laguna Honda as of July 18, 2022.

73.    The delayed response time from CDPH and CMS, their strict direction that all patients must accept their placement after July 15, 2022, and the slim likelihood that the remaining 630 patients will receive notice of an adequate placement by CMS and CDPH's fast approaching deadline of September 13, 2022, all prevent patients from exercising their right to appeal their relocation. Any patients who have not yet received notice of their placement or those who recently received it may be unable to exercise their full appeal rights given CMS's delay in responding to Laguna Honda's questions and the uncertain time period needed to conduct an appeal process.

**D.    CMS and CDPH's Actions Deny Patients their Right to Effective Discharge Planning**

74.    Federal law requires facilities "to develop and implement an effective discharge planning process that focuses on the resident's discharge goals, the preparation of residents to be active partners and effectively transition them to post-discharge care, and the reduction of factors leading to preventable

RENNE PUBLIC LAW GROUP
Attorneys at Law

readmissions." 42 C.F.R. § 483.21(c)(1).

75.    Federal law also requires facilities to ensure "that the residents would be transferred to the most appropriate facility or other setting in terms of quality, services, and location, taking into consideration the needs, choice, and best interests of each resident." 42 C.F.R. § 483.70(l)(3).

76.    CMS and CDPH's insistence on relocating patients by September 13, 2022 prevents Laguna Honda from implementing effective discharge and transfer planning for its residents. Upon information and belief, the short timeline has required the discharge of patients with as little as five-minutes notice to the physician; the transfer of patients without adequate preparation, including confirmation whether the receiving facility has appropriate resources to treat the patient's medical conditions; and Laguna Honda to assume responsibility for health problems that occur post-transfer.

77.    The absurdity of CMS and CDPH's imposed September 13 deadline is painfully obvious, not least because, since its implementation, eight patients have died following their relocation, and three discharged patients are now living in homeless shelters.

**E.    CMS and CDPH Pause All Transfers and Discharges**

78.    On July 26, 2022, the San Francisco Board of Supervisors unanimously passed a resolution imploring Defendant BECERRA to halt the Relocation Plan and extend payment to Laguna Honda until the facility can regain certification.

79.    On July 28, 2022, apparently after realizing that the requirements CMS and CDPH imposed through the Relocation Plan have been a catastrophe, CMS paused its implementation. Currently, residents of Laguna Honda will not be discharged or transferred. However, CMS has failed to give any guidance on how long it intends to pause the Relocation Plan, whether relocation will resume, and if so, on what timeline.

80.    On July 28, 2022, after no less than four patients died following their relocation, Defendant BROOKS-LASURE stated that patients should only be relocated after a thorough assessment to a safe environment where they can receive quality care. However, she failed to acknowledge that doing so was impossible for Laguna Honda given that CMS and CDPH had required Laguna Honda to relocate its patients in only four months and there is a critical shortage of nursing beds which makes this effectively impossible. She also failed to acknowledge that City officials had proposed relocating patients on a tiered

RENNE PUBLIC LAW GROUP
Attorneys at Law

system and an 18-month plan, but CMS and CDPH rejected both proposals, and imposed an impossible deadline.

81.     Upon information and belief, Defendants may order the transfer of patients to resume as early as next week—the week of August 8, 2022—just five weeks from the September 13, 2022 deadline, which remains in place.  A transfer or discharge of the represented plaintiffs or their fellow class members could be fatal or severely disruptive to their care and emotional well-being.

## CLASS-WIDE ALLEGATIONS

82.     This lawsuit is properly maintained as a class action under Federal Rules of Civil Procedure 23(b)(1)(B) and (b)(2).

83.     The class consists of the roughly 681 Medi-Cal or Medicare residents of Laguna Honda Hospital who have been or are yet to be discharged or transferred under the Relocation Plan as directed by Defendants.  A sub-class also consists of all present and future Medi-Cal or Medicare recipients who (a) reside in the City and County of San Francisco, (b) who have or will have disabilities, and (c) who, because of their disabilities need or will need inpatient and/or outpatient rehabilitative and other medical services that are currently only comprehensively provided at Laguna Honda.

84.     Plaintiffs Jane Does 1 and 2 and John Does 1 and 2 are adequate class representatives because they, like other members of the class, are residents of Laguna Honda and will be either transferred or discharged by the facility pursuant to the Relocation Plan.  Like the vast majority of the residents at Laguna Honda, they have serious disabilities or conditions that require treatment at a SNF.  Further, all of the representative Plaintiffs have familial connections in San Francisco that play a pivotal role in the coordination of their care.  As with almost every member of this class, Plaintiffs would suffer tremendous harm if they were discharged or transferred from Laguna Honda, especially in the dangerous and cruel way imposed by Defendants.

85.     Defendants' action in imposing the Relocation Plan on Laguna Honda harms all class members in the same manner.  It will cause the transfer or discharge of residents in a hasty and dangerous manner that jeopardizes their lives, deprives them of their substantive and procedural due process rights, and the statutory protections afforded to them by Federal and State law.  The sub-class will suffer further harm because, while some residents may ultimately be able to obtain services at other facilities, the sub-

RENNE PUBLIC LAW GROUP
Attorneys at Law

class will not because of their severe disabilities.

86.     As a practical matter, adjudication of Plaintiffs' claims would be dispositive of the interests of the other class members.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**(Violation of Title II of Americans with Disabilities Act against Defendants ARAGON and CDPH)**

87.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 86 above .

88.     Title II of the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12131 *et seq*.) prohibits discrimination in public services and programs.  Title II's enabling regulations provide:  "No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.130.

89.     Plaintiffs are qualified individuals with disabilities within the meaning of the ADA. Plaintiffs are presently or in the future will be excluded from participation in or denied the benefits of Laguna Honda's services, programs or activities or otherwise discriminated against by CDPH and CMS's discontinuation of funding of Laguna Honda and the September 13, 2022 deadline to relocate residents. Such exclusion, denial of benefits, or discrimination was based on Plaintiffs' disabilities.  Depriving Plaintiffs entirely of the only facility in the County that provides services disproportionately required by the disabled and available nowhere else in the County—or the State—violates Title II of the ADA.

### SECOND CLAIM FOR RELIEF

**(Violation of the Rehabilitation Act of 1973, section 504 against all Defendants)**

90.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 89 above.

91.     The Rehabilitation Act of 1973 Section 504 prohibits discrimination against persons with disabilities with respect to service availability, accessibility, delivery, employment, and the administrative activities and responsibilities of programs or activities receiving federal financial assistance or under any program or activity conducted by an executive agency.  The Rehabilitation Act's enabling regulations provide: "No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity

RENNE PUBLIC LAW GROUP
Attorneys at Law

which receives Federal financial assistance." 45 C.F.R. § 84.4(a).

92.     Plaintiffs are "qualified handicapped persons" within the meaning of the Act. CDPH receives federal financial assistance. Medicare and Medicaid are programs conducted by DHHS, an executive agency. By approving and enforcing the Relocation Plan, Defendants are denying Plaintiffs participation in and the benefit of the services at Laguna Honda, a unique facility that provides services that are not available in any other facility in violation of the Rehabilitation Act. Many disabled Plaintiffs will not be able to find necessary medical treatment elsewhere if Laguna Honda closes. The closing of the facility will have a devastating effect on the facility's predominantly disabled patients, including Plaintiffs, in violation of the Rehabilitation Act of 1973 section 504, as well as the statutes' enabling regulations, 45 C.F.R. § 84.

## THIRD CLAIM FOR RELIEF

### (Writ of Mandate Against Defendant ARAGON for Violating Federal and State Law)

93.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 92 above.

94.     Under Federal and California Law, as the Director of CDPH, Defendant had a duty to approve and oversee implementation of a relocation plan that provided for the safe transfer or discharge of residents of Laguna Honda. *See* 42 U.S.C. §§ 1320a-7j(h)(1)–(2); 42 C.F.R. § 483.70(l); 42 U.S.C. § 1396a(a)(19); CMS State Operations Manual §§ 3008.3 B–C; Health & Safety Code §§ 1325, 1336.2.

95.     Defendant also had a legal duty to approve a relocation plan that provides residents of Laguna Honda due process rights pursuant to Federal and California Law. *See*, *e.g.* 42 U.S.C. §§ 1396i-3(c)(2), 1396r(c)(2); 42 C.F.R. § 483.15(c)(1), (3)–(5); Health & Safety Code § 1336.2.

96.     SFDPH told Defendants that at minimum, 18 months were required to relocate its residents safely given the size and complexity of the facility's population and the critical shortage of nursing beds across the state. SFDPH also told Defendant that relocation should occur pursuant to a tiered system to protect vulnerable patients. Defendant ignored this warning.

97.     Defendant, working in conjunction with the Federal Defendants, then imposed a four-month relocation plan that was patently unrealistic and would require patently unsafe transfers or discharges of patients in the violation of their rights under Federal and California Law.

98.     Eight patients have died following the implementation of the September 13, 2022

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    Relocation Plan deadline.  Its deficiencies pose an immediate and substantial threat to the lives and health

2    and safety of Plaintiffs.

3                              **FOURTH CLAIM FOR RELIEF**

4    **(Deprivation of substantive due process rights in violation of the 14th Amendment against**

5                              **Defendant ARAGON)**

6        99.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 98 above.

7        100.   Plaintiffs have protected life, liberty and/or property interests to be free from emotional

8    trauma, physical danger, and/or bodily harm as well as an interest in safe and orderly transfer from Laguna

9    Honda conferred by the Medicare/Medicaid statutes and regulations and California statutes and regulations

10   governing skilled nursing facilities.

11       101.   Defendant, acting as an officer of the CDPH, joined with the Federal Defendants to impose

12   the Relocation Plan.

13       102.   The Relocation Plan has exposed Plaintiffs to potential and actual severe harms, including

14   emotional trauma, physical danger and bodily harm, including death.  Defendant's conduct shocks the

15   conscience and violates Plaintiffs' substantive rights under the Fourteenth Amendment.

16                              **FIFTH CLAIM FOR RELIEF**

17   **(Deprivation of procedural due process in violation of the Fourteenth Amendment against**

18                              **Defendant ARAGON)**

19       103.   Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 102 above.

20       104.   Plaintiffs have constitutionally protected life, liberty, and interests to be free from emotional

21   trauma, physical danger, and/or bodily harm.

22       105.   Plaintiffs also have an interest in safe and orderly transfer from Laguna Honda conferred

23   by Federal and California law regarding the provision of assistance under Title XIX of the Social Security

24   and the regulation of nursing facilities.

25       106.   Defendant, acting as an officer of the CDPH, joined with the Federal Defendants

26   BECERRA and BROOKS-LASURE to impose the current relocation plan, which injures Plaintiffs'

27   protected interests, without providing Plaintiffs with due process prior to the adoption and implementation

28   of the Plan.

107.    Defendant's conduct violates Plaintiffs' rights under the Fourteenth Amendment.

**SIXTH CLAIM FOR RELIEF**

**(Deprivation of substantive due process rights in violation of the Fifth Amendment against Defendants BECERRA, BROOKS-LASURE)**

108.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 107 above.

109.    Plaintiffs have protected life, liberty and/or property interests to be free from emotional trauma, physical danger, and/or bodily harm as well as an interest in safe and orderly transfer from Laguna Honda conferred by the Medicare/Medicaid statutes and regulations and California statutes and regulations governing skilled nursing facilities.

110.    Defendants, acting as officers of the United States government, joined with the Defendant ARAGON to impose the Relocation Plan.

111.    The plan has exposed Plaintiffs to potential and actual severe harms, including emotional trauma, physical danger, and bodily harm, including death.  Defendants' conduct shocks the conscience and violates Plaintiffs' substantive rights under the Fifth Amendment.

**SEVENTH CLAIM FOR RELIEF**

**(Deprivation of procedural due process under the Fifth Amendment against Defendants BECERRA, BROOKS-LASURE)**

112.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 111 above.

113.    Plaintiffs have constitutionally protected life, liberty, and interests to be free from emotional trauma, physical danger, and/or bodily harm.

114.    Plaintiffs also have an interest in safe and orderly transfer from Laguna Honda conferred by Federal and California law regarding the provision of assistance under Title XIX of the Social Security and the regulation of nursing facilities.

115.    Defendants, acting as officers of the United States government, joined with the Defendant ARAGON to impose the current Laguna Honda Relocation Plan, which injures Plaintiffs' protected interests, without providing Plaintiffs with due process prior to the adoption and implementation of the plan.

116.    Defendants' conduct violates Plaintiffs' rights under the Fifth Amendment.

COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND CLASS-WIDE RELIEF

RENNE PUBLIC LAW GROUP
Attorneys at Law

**EIGHTH CLAIM FOR RELIEF**

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706, against Defendants BECERRA, BROOKS-LASURE)**

117.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 116 above.

118.    Defendants, acting independently and in concert with Defendant ARAGON, imposed the Relocation Plan in violation of Plaintiffs' federal due process rights, and in violation of federal statutory and regulatory requirements concerning facility closure and resident relocation, including but not limited to the requirement that a relocation plan must provide for safe and orderly transfer of residents to adequate facilities.  The decision to impose the current Relocation Plan was a final administrative action which was arbitrary, capricious, an abuse of discretion, contrary to constitutional law, or otherwise not in accordance with law.

**NINTH CLAIM FOR RELIEF**

**(Violation of California Constitution, Article I, Section 7 for deprivation of substantive due process rights, against Defendant ARAGON)**

119.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 118 above.

120.    Plaintiffs have protected life, liberty and/or property interests to be free from emotional trauma, physical danger, and/or bodily harm.

121.    Defendants joined with the Federal Defendants BECERRA and BROOKS-LASURE to impose the Relocation Plan.  The plan has exposed Plaintiffs to potential and actual severe harms, including emotional trauma, physical danger and bodily harm, including death.  Defendant's conduct shocks the conscience and violates Plaintiffs' substantive rights under Article I, Section 7.

**TENTH CLAIM FOR RELIEF**

**(Violation of California Constitution, Article I, Section 7 for deprivation of procedural due process rights, against Defendant ARAGON)**

122.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 121 above.

123.    Plaintiffs have protected life, liberty and/or property interests to be free from emotional trauma, physical danger, and/or bodily harm as well as an interest in safe and orderly transfer from Laguna Honda conferred by the Medicare/Medicaid statutes and regulations and California statutes and regulations

RENNE PUBLIC LAW GROUP
Attorneys at Law

governing skilled nursing facilities.  Further, Plaintiffs have a dignitary interest in being informed about the nature, grounds, and consequences of state action.

124.    Defendants, acting as officers of CDPH, joined with the Federal Defendants BECERRA and BROOKS-LASURE to impose the Relocation Plan, which injures Plaintiffs' protected interests, without providing Plaintiffs with an opportunity for hearing prior to the adoption and implementation of the Relocation Plan.  Defendant's conduct deprived Plaintiffs of their procedural due process under Article I, Section 7.

## **PRAYER FOR RELIEF**

1.    Declaratory judgment that CMS and CDPH's enforcement of the September 13, 2022 deadline for transfers and termination of funding violates the statutes and regulations cited above.

2.    An injunction enjoining CMS and CDPH from forcing Laguna Honda to comply with and implement the Relocation Plan, specifically in transferring or discharging residents.

3.    An injunction against Defendant BECERRA enjoining him from halting post-termination Medicare and Medicaid payments to Laguna Honda.

4.    A writ of mandamus against Defendants ARAGON and BROOKS-LASURE directing them to withdraw the September 13, 2022 deadline for relocation and discharge.

5.    An order enjoining CMS and CDPH from imposing/approving any Relocation Plan on Laguna Honda that would force residents to be discharged or transferred.

6.    Award of reasonable attorneys' fees and costs; and

7.    Such other further relief as the Court deems just and proper.


DATED:  August 3, 2022                              RENNE PUBLIC LAW GROUP


                                                   By: _Louise H. Renne_____
                                                         Louise H. Renne

                                                   Attorneys for Plaintiffs

COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND CLASS-WIDE RELIEF