1

2

3

4                       UNITED STATES DISTRICT COURT

5

6                       NORTHERN DISTRICT OF CALIFORNIA

7   D. B. as conservator for JOHN DOE 1;
    C.C. as guardian for JANE DOE 1;
8   JOHN DOE 2; and JANE DOE 2                    No.  C 22-04501 WHA
    on behalf of themselves and all others
9   similarly situated,

10                 Plaintiffs,

11        v.                                       **ORDER RE MOTION FOR
                                                  CLASS CERTIFICATION AND
12   CHIQUITA BROOKS-LASURE, in her              ORDER TO SHOW CAUSE RE
    official capacity as Administrator for the    SUBJECT-MATTER JURISDICTION**
13   Centers for Medicare and Medicaid
    Services; CALIFORNIA DEPARTMENT
14   OF PUBLIC HEALTH; TOMAS ARAGON
    in his official capacity as Director of the
15   California Department of Public Health;
    XAVIER BECERRA in his official capacity
16   as Secretary of the U.S. Department of
    Health and Human Services; and
17   DOES 1 through 30,

18                 Defendants.

19   ─────────────────────────────

20                            **INTRODUCTION**

21        In this putative class action, plaintiffs are patients and residents of a skilled nursing

22   facility who claim that both the termination of the facility's Medicare and Medicaid funding

23   and the relocation of plaintiffs to other facilities violate federal and state law.  Plaintiffs

24   eventually wish to enjoin defendants from terminating the facility's funding and relocating

25   them.  Plaintiffs now move for class certification under FRCP 23(b)(2).  For the reasons that

26   follow, class certification is **DENIED**.

27

28

United States District Court
Northern District of California

**SUMMARY**

The essence of this long order is that this action is premature, and the district court lacks subject-matter jurisdiction.  Specifically, a district court cannot entertain claims "arising under" the Medicare Act against officers of the United States Department of Health and Human Services unless the plaintiff has exhausted administrative remedies.  42 U.S.C. §§ 405(g)–(h), 1395ii.  The Supreme Court has "construed the 'claim arising under' language quite broadly," *Heckler v. Ringer*, 466 U.S. 602, 615 (1984), "demand[ing] the 'channeling' of virtually all legal attacks" through DHHS.  *Shalala v. Ill. Council Long Term Care, Inc.*, 529 U.S. 1, 13–14 (2000).

*First*, plaintiffs claim that defendants are denying them Medicare and Medicaid benefits at Laguna Honda, constituting disability discrimination in violation of the Rehabilitation Act and the ADA.  But these are claims for benefits subject to administrative review.  *Id.* at 10; *see* 42 C.F.R. § 498.4(b)(2).  *Second*, the APA and due process claims allege the relocation plan fails to provide for the safe and orderly transfer of residents to adequate facilities.  Those claims, however, are "inextricably intertwined with what . . . is in essence a claim for benefits."  *Heckler*, 466 U.S. at 624.  Laguna Honda *voluntarily elected* to undergo closure and relocation *in order to receive federal post-termination benefits*.  To order an extension of the relocation process with continued funding would be tantamount to approving a claim for benefits.  And, regardless, claims "collateral" to benefits claims arise under the Medicare Act.  *Ill. Council*, 529 U.S. at 13–14.  *Third*, nor does the district court have subject-matter jurisdiction under 28 U.S.C. Section 1361.  The Secretary of DHHS and the Director of the California Department of Public Health had discretion to continue funding Laguna Honda after termination (pending relocation).  42 C.F.R. §§ 483.70(l), 489.55(b); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).  *Fourth*, all federal and state law claims against our state defendants arise under the Medicare Act because they are "'merely [] disguised dispute[s] with the Secretary,'" and we cannot exercise supplemental jurisdiction over them absent federal subject-matter jurisdiction.  *Hooker v. U.S. Dep't of Health & Human Servs.*, 858 F.2d 525, 529 (9th Cir. 1988).

Due to the foregoing, plaintiffs must "present" their claims to the Secretary and "exhaust" administrative remedies within DHHS before seeking judicial review. *Sensory Neurostimulation, Inc. v. Azar*, 977 F.3d 969, 981 (9th Cir. 2020). Although presentment is satisfied here, exhaustion is not satisfied because the City and County's appeal is still pending. The district court may waive the exhaustion requirement. But waiver is inappropriate here because all the claims to be reviewed are "essentially . . . claim[s] for benefits" — not "collateral" claims. *Johnson v. Shalala*, 2 F.3d 918, 921 (9th Cir. 1993).

Nor does the "*Michigan Academy* exception" save plaintiffs' claims. *First*, each patient has the right to review with CDPH a decision to relocate him or her. 42 C.F.R. § 431.220(a)(2). *Second*, the City and County can administratively appeal (and has appealed) the termination of benefits effectively on behalf of plaintiffs, and a successful appeal would cancel the closure and relocation process. *See Sensory*, 977 F.3d at 983. *Third*, despite federal regulations that suggest otherwise, the City and County can seek judicial review of the relocation plan effectively on behalf of plaintiffs. *Ill. Council*, 529 U.S. at 23–24. *Fourth*, plaintiffs themselves may seek judicial review of the relocation plan *on their own* after the City and County exhausts administrative remedies because they would be "aggrieved" parties for purposes of statutes that require safe transfer of patients. 5 U.S.C. § 702; *see Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395–96 (1987).

Because the district court does not have subject-matter jurisdiction over any claims, class certification must be denied. And, even if the district court had subject-matter jurisdiction, there would be a further problem with class certification, namely, an inherent conflict of interest within the proposed class. Some patients can be expected to prefer transfer to another facility rather than to remain at Laguna Honda, given its history of health and safety violations. Thus, a FRCP 23(b)(2) class could not be certified because enjoining the closure and relocation process would not be appropriate for every patient. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

**STATEMENT**

Plaintiffs and the putative class members are patients and residents of Laguna Honda Hospital, a skilled nursing facility in San Francisco.  The City and County of San Francisco owns the facility and operates it through the San Francisco Department of Public Health.  Specifically, the following persons are responsible for ensuring that the facility provides quality care and complies with the law:  the Director of the San Francisco Health Network, Roland Pickens, who reports to the Director of Health of SFDPH, Grant Colfax, who reports to the President of the San Francisco Health Commission, Dan Bernal, who reports to both the Mayor of San Francisco and the President of the San Francisco Board of Supervisors.

Laguna Honda has been providing skilled nursing services for over 150 years.  In 2010, the City and County completed construction of three state-of-the-art buildings to augment Laguna Honda's original campus.

Today, the more than 600 patients at Laguna Honda suffer from serious medical conditions and disabilities, such as Alzheimer's, multiple sclerosis, brittle diabetes, mental retardation, and Parkinson's.  Many of the patients do not have financial means to pay for treatment on their own.  Instead, Laguna Honda treats Medicare- and Medicaid-eligible patients and receives government reimbursements.  In general, the Medicare Act benefits elderly and disabled persons while the Medicaid Act benefits persons with low income. 42 U.S.C. §§ 1395 *et seq.*, 1396 *et seq.*

To receive reimbursements from the federal government and California, Laguna Honda executed "provider agreements" with DHHS and CDPH.  The agreements required that Laguna Honda maintain "substantial compliance" with health and safety requirements under the Medicare and Medicaid acts to receive funding.  "Substantial compliance means a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301.

The federal Center for Medicare and Medicaid Services is an entity within DHHS that enforces the conditions of participation by conducting periodic surveys (*i.e.*, inspections) of

United States District Court
Northern District of California

providers' facilities.  CMS executes agreements with state agencies, such as CDPH, to carry out the surveys.  42 U.S.C. § 1395aa(a).  Surveys are conducted by multidisciplinary teams of professionals, which always include a registered professional nurse.  No team member may have a conflict of interest with respect to any facility he or she is to survey.  Each team member must have completed a training and testing program in survey and certification techniques that has been approved by the Secretary.  42 U.S.C. § 1395i-3(g)(2)(E).  To qualify for an entry-level surveyor position, one must possess a bachelor's degree in a recognized health field or have significant administrative or clinical experience in health policy programming.  Senior-level positions require more education and experience than do entry-level positions.

When a provider fails to substantially comply with the participation requirements, CMS may terminate the provider's Medicare and Medicaid agreements, impose alternative remedies, or do both.  *By statute, CMS must terminate a skilled nursing facility's provider agreements after six months of noncompliance*.  42 U.S.C. §§ 1395i-3(h)(2), 1396r(h)(3).  If a skilled nursing facility incurs a violation that "immediately jeopardizes the health or safety of its residents," the Secretary must take immediate action to remedy the issue or terminate the facility's provider agreements.  42 U.S.C. §§ 1395i-3(h)(4), 1396r(h)(5).  "Immediate jeopardy means a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident."  42 C.F.R. § 488.301.

Funding may continue for up to 30 days after termination.  But, if the provider agrees to submit a plan to close its facility and transfer its residents to other, compliant facilities, the Secretary has discretion to continue funding until the closure deadline, the date of which is subject to DHHS and CDPH approval.  42 C.F.R. §§ 483.70(l), 489.55(a)–(b).

A provider may appeal a decision to terminate its provider agreements to an administrative law judge within DHHS.  If the appeal fails, the provider may seek review by the Departmental Appeals Board of DHHS.  Only thereafter may a provider seek judicial review.  42 U.S.C. § 1395cc(h)(1)(A); 42 C.F.R. § 498.5(b)–(c).

Congress has:

> identified as a serious problem 'the large numbers of marginal or
> substandard nursing homes that are chronically out of compliance
> when surveyed, may or may not be subject to mild sanctions,
> temporarily correct their deficiencies under a plan of correction,
> and then quickly lapse into noncompliance until the next annual
> survey.' . . . [I]f there ever was a valid reason to allow nursing
> facilities to operate with numerous and repeated deficiencies, it no
> longer applies. . . . [T]he Secretary and the States are expected to
> eliminate substandard providers from the program and to deter
> repeat violations, not to allow substandard providers to remain in
> the program through a policy or practice of consultation.

H.R. Rep. 100-39(I) at 471 (1987) (findings and recommendations of the Committee on

Energy and Commerce as to the Concurrent Resolution on the Budget for Fiscal Year 1988).

The Secretary has repeatedly found Laguna Honda to be a substandard provider, so he

finally decertified Laguna Honda. This dispute arises from that decertification. CMS

terminated Laguna Honda's provider agreements after multiple surveys revealed serious,

repeated violations of Medicare and Medicaid requirements. The first survey was performed in

July 2019. CDPH conducted a full-length survey of Laguna Honda that found five violations.

Four of the violations reached the level of immediate jeopardy. Of 29 sampled patients:

- (i) 19 suffered privacy violations, which included two staff members taking (and
  sharing with other staff members) pictures and videos of naked patients, open
  wounds and discolorations on patients' bodies, medication administrations, staff
  members encouraging patients to make sexual remarks, staff members making
  derogatory remarks toward patients, and a staff member kicking a patient;

- (ii) seven suffered verbal, physical, sexual, and mental abuse, as mentioned
  above, including staff provoking patients and restraining patients (*e.g.*, tying a
  towel around a patient's mouth);

- (iii) five received unprescribed medications, resulting in five life-threatening
  complications and significant decline in physical function; and

- (iv) several patients experienced abuse that went unreported.

The immediate jeopardy status was lifted once Laguna Honda presented an acceptable

correction plan. CMS imposed a fine of over $730,000 for the violations.

Thereafter, CDPH conducted eleven abbreviated surveys in response to facility-reported incidents from October 2020 through March 2022.  CDPH recorded many violations, including:  an immediate jeopardy for failing to secure and allowing a patient to hoard oxycodone, percocet, ecstasy, marijuana, lighters, and scissors; allowing 13 of 37 sampled patients to take unprescribed drugs, which resulted in two life-threatening hospitalizations, two falls, and six cases of significant behavioral changes; failing to report an altercation between patients; failing to develop and implement patient-specific care plans; failing to fasten a patient's seatbelt, whereafter the patient suffered fractured bones and died three months later; failing to address a patient's dangerous behavior, resulting in self-inflicted injury to the patient; allowing three of ten sampled patients to obtain contraband; failing to administer blood-pressure medication, causing a patient to suffer a stroke and "total dependence on caregivers" (he required only "minimal assistance" beforehand); an immediate jeopardy for allowing several patients to smoke tobacco or illicit substances indoors, including allowing a patient to light a cigarette while using an oxygen respirator (a fire hazard); and an altercation where a staff member punched a patient in the face and grasped the patient's genitalia, resulting in pain and injury to the patient.  After every survey, Laguna Honda submitted an acceptable correction plan to address the violations.

Despite the promise of the correction plans, Laguna Honda failed to remedy the violations.  Thus, on March 30, 2022, CMS notified Laguna Honda that it would terminate the facility's Medicare and Medicaid provider agreements on April 14, 2022 (on which date Laguna Honda would have been out of compliance for at least six months).  The notice provided that, only for residents admitted prior to January 14, 2022, funding would continue until the date of termination and "may continue on or after . . . the date of termination to allow for the safe and orderly transition."  It also stated:

> If the provider demonstrates substantial compliance with all CMS requirements, and a revisit survey confirms substantial compliance, prior to April 14, 2022, the provider will remain active in the Medicare Program and CMS will not terminate [its] provider agreement.

United States District Court
Northern District of California

Pursuant to the notice, on April 13, 2022, CDPH conducted a final survey.  CDPH recorded many violations, including:  failing to administer oxygen therapy to a patient with lung disease; allowing a patient to self-administer medication without a physician's order; failing to update patients' medication lists; allowing patients to obtain scissors; failing to perform pain assessments; failing to keep medications in locked storage for eight of eight sampled patients; failing to wear personal protective equipment while caring for patients; failing to wash hands; allowing bags of trash and soiled linens to overflow; allowing an individual into the facility while he awaited a COVID-19 rapid-test result; and performing COVID-19 testing indoors.  On April 14, 2022, CMS terminated Laguna Honda's provider agreements and imposed roughly $400,000 in fines.

The City and County has appealed CMS's decertification decision to an administrative law judge and has requested expedited hearings.  The appeal remains pending.

After termination, Laguna Honda hired a private company to conduct two mock surveys (analogous to CDPH surveys) to assess its compliance with federal and state law.  Those two mock surveys, performed in July 2022 and August 2022, revealed a total of 101 distinct violations, including seven immediate jeopardy violations.  "[The] findings were significant in number, scope, and severity.  . . . [The violations] reflect[ed] deficiencies hospital-wide and span[ned] nearly all disciplines, including infection control, resident rights, freedom from abuse, neglect, exploitation, quality of care, and more."  Both surveys concluded that Laguna Honda would have failed a CDPH survey to reinstate its provider agreements.

The federal termination notice gave Laguna Honda an option to continue to receive post-termination funding beyond the 30-day cutoff:

> CMS is exercising a rare use of discretion under our authority, 42 C.F.R. § 489.55(b), to provide for a transition period following the termination for the facility closure process should the facility elect to submit a notification of closure under [42 C.F.R.] § 483.70(l).

8

42 C.F.R. Section 489.55(b) states:

> The Secretary may, as the Secretary determines is appropriate,
> continue to make payments with respect to residents of a long-term
> care facility that has submitted a notification of closure as required
> at [Section] 483.70(l) of this chapter during the period beginning
> on the date such notification is submitted and ending on the date on
> which the residents are successfully relocated.

Accordingly, on May 9, 2022, Laguna Honda submitted to CMS a notification of closure and relocation. Laguna Honda proposed an 18-month relocation plan. CMS and CDPH rejected the plan and specified a four-month relocation plan as acceptable if Laguna Honda wished to receive post-termination benefits. Laguna Honda submitted such a four-month plan and gained approval for funding to continue until September 13, 2022, the deadline to relocate all patients to other, compliant facilities.

Thus far, Laguna Honda has relocated only 57 residents (of over 600). Nine patients died after relocation. Thereafter, CMS agreed to pause patient relocations. Later, in August 2022, CMS, CDPH, and the City and County issued a joint statement announcing a further relocation pause with funding to continue to Laguna Honda through November 13, 2022. These deadlines were later extended again, as shown below.

There are no facts in our record regarding the cause or circumstances of any patient's death. CDPH's investigation of the incidents is ongoing. However, plaintiffs and amicus curiae have submitted declarations of doctors, emphasizing the lack of comparable facilities in the Bay Area to which patients at Laguna Honda can be transferred. The declarations provide that, if the relocation deadline stands, patients would not have sufficient time to find alternative facilities. Or, there may not be enough alternative facilities at all. The declarations also highlight that patients may suffer adverse physiological reactions to sudden changes in environment — known as "transfer trauma." Other courts have recognized the adverse health effects of transfer trauma. *Bracco v. Lackner*, 462 F. Supp. 436, 444–46 (N.D. Cal. 1978) (Judge Stanley Weigel); *Yaretsky v. Blum*, 629 F.2d 817, 821 (2d Cir. 1980), *rev'd on other grounds*, 457 U.S. 991 (1982); *see* Cal. Health & Safety Code § 1336.2.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to a prior order, the parties provided a joint statement regarding the number of available Medicare and Medicaid beds at skilled nursing facilities in San Francisco and in neighboring cities.  There are approximately 288 beds available in San Francisco.  There are over 4,000 beds available in neighboring cities.  The following cities are amongst the nearest to San Francisco and have approximately 1,105 beds available in total:  Oakland; Alameda; Daly City; Pacifica; San Mateo; San Leandro; San Rafael; and Walnut Creek.

On the eve of our hearing on October 13, 2022, the parties submitted a joint stipulation, providing that the City and County had reached a settlement-in-principle with CMS and CDPH.  If approved by the Mayor and the Board of Supervisors of San Francisco, the agreement would extend the pause in relocations until February 2, 2023, with a possibility for further extension if Laguna Honda makes certain health and safety improvements by that time. It would also extend Medicare and Medicaid funding until November 13, 2023, contingent on health and safety improvements.[1]

Perhaps oddly, our patient plaintiffs are not suing Laguna Honda, the San Francisco Department of Public Health, or anyone else responsible for the decline in health care at Laguna Honda.  Instead, they are suing federal personnel who have cut off funding (or threaten to) by reason of the mismanagement of Laguna Honda.  Specifically, four patients of Laguna Honda have sued Xavier Becerra (in his official capacity as Secretary of DHHS) and Chiquita Brooks-Lasure (in her official capacity as Administrator for CMS) (together, "federal defendants").  They have also sued Tomas Aragon (in his official capacity as Director of CDPH) and CDPH (together, "state defendants").

Plaintiffs bring claims for violation of the Rehabilitation Act (against all defendants), violation of due process (against all defendants except state defendant CDPH), violation of the Administrative Procedure Act (against only federal defendants), violation of the Americans

---

[1]  Laguna Honda requires $312 million per year to operate.  Of that, $216 million (70 percent) is covered by Medicare and Medicaid reimbursements.  The $216 million figure is equivalent to 1.55 percent of the City and County's total budget of $13.95 billion for fiscal year 2022–2023.

with Disabilities Act (against only state defendants), and mandamus (against only state

defendant Aragon).[2]

Plaintiffs now seek class certification of a FRCP 23(b)(2) class.  This order follows full

briefing and oral argument.

### ANALYSIS

Defendants argue that the district court does not have subject-matter jurisdiction over any

claims against them, barring class certification (and, for that matter, entry of any preliminary

injunction).  *See Munoz v. Sullivan*, 930 F.2d 1400, 1401 (9th Cir. 1991); *Sires v. State of

Wash.*, 314 F.2d 883, 884 (9th Cir. 1963).  Here is our framework:

> The Social Security Act contains an exclusive remedy provision,
> [42 U.S.C.] Section 405(h), which bars suits brought under
> [28 U.S.C.] Section 1331 "[against the United States, the
> Commissioner of Social Security, or any officer or employee
> thereof . . .] to recover on any claim arising under" the Act.
> Claims deemed to "arise under" the Act can only be brought in
> federal court in accordance with the judicial review prerequisites
> of Section 405(g).  These prerequisites include:  (i) presentment of
> a claim for benefits to the Secretary of the agency; and
> (ii) exhaustion of administrative remedies.  The first element
> (presentment) is *not* waivable, but the second element (exhaustion)
> *is* waivable.

*Am. Council of the Blind v. Astrue*, No. C 05-04696 WHA, 2008 WL 1858928, at *4

(N.D. Cal. Apr. 23, 2008) (citations omitted) (emphasis in original).

Subsection "(h) . . . of Section 405 . . . also appl[ies] with respect to [the Medicare Act],"

and "any reference therein to the Commissioner of Social Security or the Social Security

Administration shall be considered a reference to the Secretary or the Department of Health

and Human Services, respectively."  42 U.S.C. § 1395ii.  Therefore, plaintiffs must exhaust

administrative channels under the Medicare Act before bringing any claim arising under the

Medicare Act against our federal defendants (the Secretary and an officer of DHHS).

---

[2]  The City and County also sued the Secretary (as well as DHHS) for violations of the APA and
due process in connection with the decertification of Laguna Honda and the relocation plan.
No motions are pending in that action.  Case No. C 22-04500 WHA.

11

United States District Court
Northern District of California

### 1. PLAINTIFFS' CLAIMS ARISE UNDER THE MEDICARE ACT.

The Supreme Court has "construed the 'claim arising under' language quite broadly to include any claims in which 'both the standing and the substantive basis for the presentation' of the claims is the [Medicare] Act." *Heckler*, 466 U.S. at 615 (citation omitted).  Moreover, Supreme Court precedent:

> foreclose[s] distinctions based upon the "potential future" versus the "actual present" nature of the claim, the "general legal" versus the "fact-specific" nature of the challenge, the "collateral" versus "noncollateral" nature of the issues, . . . the "declaratory" versus "injunctive" nature of the relief sought.

As such, Section 405(h) "demands the 'channeling' of virtually all legal attacks" through the administrative review process prior to judicial review.  In that way, Section 405(h):

> assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying "ripeness" and "exhaustion" exceptions case by case.  But this assurance comes at a price, namely, occasional individual, delay-related hardship. In the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified.

*Ill. Council*, 529 U.S. at 13–14 (citations omitted).

#### A. THE REHABILITATION ACT AND ADA CLAIMS.

Plaintiffs claim that defendants are denying them Medicare benefits at Laguna Honda, constituting disability discrimination in violation of the Rehabilitation Act and the ADA (Compl. ¶¶ 89, 92).  Because the claims challenge the lawfulness of a denial of benefits, the claims arise under the Medicare Act, irrespective of their statutory nature.  *Ill. Council*, 529 U.S. at 10, 13.  And, the administrative review process applies equally to "CMS's determination to terminate [Laguna Honda]'s *Medicaid* provider agreement."  42 C.F.R. § 498.3(a)(2)(i) (emphasis added); *see* 42 U.S.C. § 1395hh(a)(1)–(2) (authorizing the Secretary to prescribe substantive regulations); *see also* 42 C.F.R. §§ 498.4(b)(2), 498.5(b)–(c); *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 366–67 (6th Cir. 2000).

Furthermore, the ADA claim against state defendants is also subject to Section 405(h) because it is "'merely a disguised dispute with the Secretary.'" *Hooker*, 858 F.2d at 529. "To hold otherwise arguably would invite applicants for . . . benefits to circumvent [Sections] 405(g) and (h) by bringing suit under [28 U.S.C. Section] 1331 against the state officials instead of the Secretary." *Ellis v. Blum*, 643 F.2d 68, 76 (2d Cir. 1981).

This district court's holding in *American Council*, moreover, does not demonstrate that the Rehabilitation Act claim here circumvents Section 405(h). In *American Council*, "[the] plaintiffs' grievance [was] untethered to any benefit claim and relate[d] only to notice[]" requirements under the Rehabilitation Act. By contrast, plaintiffs here are "making an immediate claim for benefits," so Section 405(h) plainly applies. 2008 WL 1858928, at *5–6.

Additionally, the pleaded facts are insufficient to deem either the Rehabilitation Act or the ADA claim plausible. Both claims require discrimination *because of* disability. *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) (emphasis added); *Voytek v. Univ. of Cal.*, 77 F.3d 491 (9th Cir. 1996). *But CMS discontinued funding because of Laguna Honda's Medicare and Medicaid violations*. Moreover, plaintiffs' assertion that Laguna Honda provides services disproportionately required by the disabled that are "available nowhere else" is contradicted by other evidence (Compl. ¶ 89). Namely, there are 288 available beds at CMS-certified skilled nursing facilities in San Francisco, and over 4,000 in neighboring cities (Dkt. No. 82). This order need not accept "unwarranted deductions of fact." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## B.   THE APA AND DUE PROCESS CLAIMS.

The above demonstrates that the Rehabilitation Act and ADA claims against both federal and state defendants arise under the Medicare Act. We now turn to the APA and due process claims, which allege that the relocation plan fails to provide for the safe and orderly transfer of residents to adequate facilities (Compl. ¶¶ 99–124).

1

2

3

4

5

6

7

8

9

United States District Court
Northern District of California

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Those claims, however, are "inextricably intertwined with what . . . is in essence a claim for benefits." *Heckler*, 466 U.S. at 624. But for Laguna Honda's Medicare and Medicaid violations and the resultant termination of its benefits, there would be no closure or relocation. More importantly, Laguna Honda *voluntarily elected* to undergo closure and relocation *to receive post-termination benefits*. *See* 42 C.F.R. § 489.55(b). To require federal defendants to extend the relocation process and continue post-termination funding would be tantamount to approving a claim for benefits. And, this action cannot enjoin the City and County of San Francisco from closing Laguna Honda and relocating its patients, for the City and County is not a defendant (by plaintiffs' choice).

Even if the relocation issue were not intertwined with the termination of benefits, "the 'collateral' versus 'noncollateral' nature of the issues" is a distinction without a difference. Nothing "limits the scope of [Section] 405(h) to claims for monetary benefits." In fact, "claims that contest *a sanction or remedy*," like the APA and due process claims, are subject to Section 405(h). *Ill. Council*, 529 U.S. at 13–14 (emphasis added); *see also* 42 C.F.R. § 488.406(a)(6).

Moreover, Section 1395ii of the Medicare Act "plainly bars" the APA and due process claims, "irrespective of whether [plaintiffs] challenge[] . . . on evidentiary, rule-related, *statutory*, *constitutional*, or other legal grounds." *Ill. Council*, 529 U.S. at 10 (emphasis added). That federal defendants' duty to protect the health and safety of residents arises under only the Medicaid Act does not allow plaintiffs to circumvent the administrative review process. 42 C.F.R. § 498.3(a)(2)(i). And, the federal and state law claims against state defendants are merely disguised disputes with the Secretary subject to Section 405(h). *See Hooker*, 858 F.2d at 429; *Ellis*, 643 F.2d at 76. There being no federal subject-matter jurisdiction, there is no occasion to exercise supplemental jurisdiction over the state law claims against the state defendants.

United States District Court
Northern District of California

## C.   THE MANDAMUS CLAIM.

The foregoing establishes that all of plaintiffs' statutory and constitutional claims made pursuant to 28 U.S.C. Section 1331 arise under the Medicare Act and must be channeled through DHHS before judicial review becomes available. The same applies to plaintiffs' mandamus claim under 28 U.S.C. Section 1361 (Compl. ¶¶ 93–98). Mandamus "is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" The exercise of mandamus jurisdiction is appropriate only when there is "[1] 'no other adequate means to attain the relief,' [2] '[the] right to issuance of the writ is clear and indisputable,' [and] [3] the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004) (citations omitted) (cleaned up). Mandamus is "limited to enforcement of 'a specific, unequivocal command,' the ordering of a 'precise, definite act about which an official had no discretion whatever.'" *Norton*, 542 U.S. at 63 (citations omitted) (cleaned up). The official's duty must be "ministerial" and "so plainly prescribed as to be free from doubt." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 219 (1930).

As discussed below, plaintiffs have other adequate means to attain relief. Moreover, state defendant Aragon (the Director of CDPH) does not have a clear, indisputable duty to approve any relocation plan (such as Laguna Honda's proposed 18-month plan). Rather, he has discretion to do so. 42 C.F.R. § 483.70(l)(3). Thus, mandamus is inappropriate. *See Cheney*, 542 U.S. at 380–81.

Plaintiffs' mandamus claim, moreover, is distinguishable from proper mandamus claims brought on constitutional grounds, wherein "once the court interpret[ed] the law, the defendant's duty [was] clear; the court [was] not telling the defendant *how* to exercise his discretion." Defendant Aragon's duty would not be clear if he were deemed to have violated due process. What would be a proper timetable for closure and relocation? In what order would patients be relocated? For how long would defendants need to continue post-termination funding? *Elliott v. Weinberger*, 564 F.2d 1219, 1226 (9th Cir. 1977) (emphasis added), *aff'd in part*, *rev'd in part on other grounds sub nom. Califano v. Yamasaki*, 442 U.S. 682 (1979); *see Leschniok v. Heckler*, 713 F.2d 520, 521–22 (9th Cir. 1983); *Briggs v.*

*Sullivan*, 886 F.2d 1132, 1142 (9th Cir. 1989).  Furthermore, "28 U.S.C. [Section] 1361 . . . [is] independent grounds for jurisdiction in review of constitutional challenges which," unlike those here, "*do not directly seek payment of social security benefits*."  *Leschniok*, 713 F.2d at 522 (9th Cir. 1983) (citing *Elliot*, 564 F.2d at 1225 n. 8a) (emphasis added).

To the extent that plaintiffs claim defendants have a duty to provide at least 30-day notice to patients of the facilities to which they are to be transferred, that is incorrect.  Under 42 C.F.R. Section 483.15(c), "the *facility* must" notify the patients (emphasis added).  Moreover, defendants initially gave Laguna Honda four months to notify the patients.

### 2.   PLAINTIFFS HAVE NOT EXHAUSTED ADMINISTRATIVE REMEDIES.

Because the above shows that all of plaintiffs' claims must be "channeled" through DHHS before being filed in the district court, we must consider whether plaintiffs have exhausted their administrative remedies.

The City and County, effectively on behalf of plaintiffs, has not exhausted its administrative remedies.  *See Sensory*, 977 F.3d at 983.  Its appeals remain pending before an administrative law judge.  If the appeals fail, the City and County would have to seek review by the Departmental Appeals Board of DHHS.  Only thereafter could the City and County — or, as explained below, plaintiffs — seek judicial review.  42 C.F.R. § 498.5(b)–(c).

Yet another route to subject-matter jurisdiction is (i) presentment and (ii) waiver of the exhaustion requirement.  *Am. Council*, 2008 WL 1858928, at *4.  As to presentment, the City and County appealed the decertification decision (Dkt. No. 32-4), and it sent a letter to DHHS challenging the closure and relocation plan (Dkt. No. 32-5).  So the presentment element is satisfied.  *See Mathews v. Eldridge*, 424 U.S. 319, 329 (1976); *Cassim v. Bowen*, 824 F.2d 791, 794 (9th Cir. 1987).

But waiver of the exhaustion requirement is inappropriate here.  "Waiver is proper if the claim to be reviewed is '(1) collateral to a substantive claim of entitlement (collaterality), (2) colorable in its showing that refusal to the relief sought will cause an injury which retroactive payments cannot remedy (irreparability), and (3) one whose resolution would not serve the purposes of exhaustion (futility).'"  *Briggs*, 886 F.2d at 1139.  Here, as explained

United States District Court
Northern District of California

above, all the claims to be reviewed are "essentially . . . claim[s] for benefits" — not collateral claims.  *Johnson*, 2 F.3d at 921.

In addition, Ninth Circuit and Supreme Court decisions that have identified collateral claims are inapposite.  Such decisions include either (i) claims that an agency systematically ignored a ministerial duty, or (ii) procedural due process claims wholly divorced from benefits claims.[3]  As explained above, there is no ministerial duty at issue here.  And, the due process claims are intertwined with claims for benefits.  *See, e.g.*, *Weinberger v. Salfi*, 422 U.S. 749, 759 (1975).

Finally, plaintiffs' due process claims have no merit:

> This case does not involve the withdrawal of direct benefits.  Rather, it involves the Government's attempt to confer an indirect benefit on Medicaid [and Medicare] patients by imposing and enforcing minimum standards of care on facilities like [Laguna Honda].  When enforcement of those standards requires decertification of a facility, there may be an immediate, adverse impact on some residents.  But surely that impact, which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property.

> \*          \*          \*

> [The Medicaid Act] clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified. . . . [A]lthough the regulations do protect patients by limiting the circumstances under which a *home* may transfer or discharge a Medicaid recipient, they do not purport to limit the Government's right to make a transfer necessary by decertifying a facility.

*O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 785, 787 (1980) (emphasis in original); *see Bumpus v. Clark*, 681 F.2d 679, 685–87 (9th Cir. 1982), *withdrawn as moot*, *reh'g denied*, 702 F.2d 826 (9th Cir. 1983).  Thus, plaintiffs' due process claims fail for lack of a protected interest.  *See also Hoye v. Sullivan*, 985 F.2d 990, 991–92 (9th Cir. 1992) ("A constitutional claim is not 'colorable' if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial or frivolous.'").

---

[3]  *See, e.g.*, *Anderson v. Babbitt*, 230 F.3d 1158 (9th Cir. 2000); *Girard v. Klopfenstein*, 930 F.2d 738 (9th Cir. 1991); *Cassim*, 824 F.2d 791.

### 3.     THE "*MICHIGAN ACADEMY* EXCEPTION" DOES NOT APPLY.

The above demonstrates that all of plaintiffs' claims arise under the Medicare Act and that plaintiffs have neither exhausted administrative remedies nor satisfied the waiver requirements.  The only remaining path to subject-matter jurisdiction, therefore, is the so-called "*Michigan Academy* exception," which permits circumvention of Section 405(h) when its application will result in "no review at all."  *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 680 (1986).

That exception, however, does not allow plaintiffs to avoid Section 405(h)'s channeling requirement.  *First*, each patient has the right to review with CDPH a decision to relocate him or her:  "When a patient *chooses to appeal* the discharge . . ., Laguna Honda *may not discharge the patient while the appeal is pending*, unless the failure to discharge or transfer would endanger the health or safety of the patients or other individuals" (Dkt. No. 32-2 at 13) (emphasis added); *see* 42 C.F.R. §§ 431.220(a)(2); 483.15(c)(1)(ii).

*Second*, the City and County can appeal (and has appealed) the termination of benefits effectively on behalf of plaintiffs, and a successful appeal would cancel the closure and relocation process.  "[T]he *Michigan Academy* exception does not apply where," as here, "another party is able to pursue the same claim through an appropriate administrative channel and is incentivized to do so."  *Sensory*, 977 F.3d at 983.

*Third*, despite federal regulations that suggest otherwise, the City and County can seek judicial review of the relocation plan effectively on behalf of plaintiffs.  *See* 42 C.F.R. § 498.3(b)(13), (d). The Supreme Court has stated:

> [Plaintiff] complains that a host of procedural regulations unlawfully limit the extent to which the agency itself will provide the administrative review channel leading to judicial review, for example, regulations insulating from review . . . a determination to impose one, rather than another, penalty.  [Plaintiff] remain[s] free, however, after following the special review route that the statutes prescribe, to contest in court the lawfulness of any regulation or statute upon which an agency determination depends.  The fact that the agency might not provide a hearing for that *particular contention*, or may lack the power to provide one, . . . is beside the point because it is the "action" arising under the Medicare Act that must be channeled through the agency.  After the action has been so channeled, the court will consider the contention when it later

18

> reviews the action. And a court reviewing an agency
> determination under [Section] 405(g) has adequate authority to
> resolve any statutory or constitutional contention that the agency
> does not, or cannot, decide, including, where necessary, the
> authority to develop an evidentiary record.

*Ill. Council*, 529 U.S. at 23–24 (emphasis in original). In fact, the APA expressly gives district courts such authority. 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."); *see also Citizens for Clean Air v. E.P.A.*, 959 F.2d 839, 845–46 (9th Cir. 1992). Therefore, because the City and County can channel the *action* through DHHS and later contest the lawfulness of the relocation plan in the district court effectively on behalf of patients, the regulations do not preclude judicial review of the plan.

The City and County has shown, moreover, that it is "sufficiently incentivized" to seek judicial review. *Sensory*, 977 F.3d at 975. The City and County has already appealed the decertification decision. Moreover, it wrote to DHHS to challenge the closure and relocation plan. The letter stated that "implementation of the schedule under the current closure plan conflicts with [the] goal" of "ensuring patient health, safety, and welfare." And, the letter warned of due process violations (Dkt. No. 32-5 at 4).

*Fourth*, plaintiffs may seek judicial review of the relocation plan *on their own* after the City and County exhausts administrative remedies. The APA, 5 U.S.C. § 702, allows this because plaintiffs are "aggrieved" persons whose interests are consistent with the purpose of 42 U.S.C. Section 1396r(f)(1), which establishes "the duty . . . of the Secretary to . . . protect the health, safety, welfare, and rights of residents . . . ." *See Clarke*, 479 U.S. at 395–400.

Furthermore, the Medicare Act does not interfere with plaintiffs' right to seek judicial review under the APA. The Medicare Act purports to prohibit judicial review of any final decision of the Secretary. 42 U.S.C. §§ 405(h), 1395ii. But judicial review is permissible after presentment and exhaustion of administrative remedies. 42 U.S.C. § 405(g). Because the statutory preclusion is "'less than absolute,'" judicial review by plaintiffs — after the City and County exhausts administrative remedies — "is favored." *Amgen, Inc. v. Smith*, 357 F.3d 103, 112 (D.C.Cir. 2004) (citation omitted); *see Allen v. Milas*, 896 F.3d 1094, 1103 (9th Cir. 2018).

19

Because the district court does not have subject-matter jurisdiction over any claims, class certification must be denied.

*          *          *

Even if the district court had subject-matter jurisdiction, there would be a further problem with class certification, namely, an inherent conflict of interest within the proposed class. Plaintiffs seek to certify a class under FRCP 23(b)(2), which "allows class treatment when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class *as a whole*.'"  "It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant."  *Wal-Mart*, 564 U.S. at 360 (first emphasis added) (citation omitted).

Within the class, some of the 600-plus patients can be expected to prefer transfer to a safe facility rather than to remain at Laguna Honda, given its health and safety violations.  All our named plaintiffs would like to remain, but that does not dictate a similar attitude for the proposed class members.  Accordingly, the proposed class could not be certified. (Named plaintiffs, of course, could litigate for themselves once the administrative procedures eventually run their course.)

**CONCLUSION**

For the foregoing reasons, the motion for class certification must be **DENIED**.  For the same reasons, this civil action and its companion action (*City and County of San Francisco v. United States Department of Health and Human Services, et al.*, No. C 22-04500 WHA) should be dismissed for lack of subject-matter jurisdiction.  This will serve the beneficial role of allowing plaintiffs to appeal and perhaps win a ruling prior to the resumption of relocations in February.

In both cases, plaintiffs have **FOURTEEN CALENDAR DAYS** to show cause why this case and its companion case should not be dismissed, failing which judgment shall be entered (to facilitate an appeal).[4]

**IT IS SO ORDERED.**

Dated:  November 9, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[4]  The district court takes judicial notice of only the relevant, undisputed facts in the Statement section herein.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

21